In the court below it was referred to the master to state an account of the administration of Finch's estate, and to his report exceptions were taken by both parties; after which the cause was transmitted to this Court, and here, at December Term, 1831, the exceptions were argued by
The first exception of the plaintiff embraces a number of items of disbursement by the administrator, which it is said ought not to be allowed because the payments are not expressly proved, but evidenced only in some cases by the receipts of the creditors and in others by possession of the justices' judgments. *Page 117 
It does not appear that this objection was made before the master. It would be manifestly unjust to take the parties by surprise with it here. All the bonds are receipted, and also the judgments given against the intestate himself; and they appear to be fair upon their face. Such receipts of persons living are not strictly legal evidence to show a full administration, and especially upon accounts. But when they are taken and acted on by the master, without objection then made, one cannot be heard in a subsequent stage, unless it be founded on something unfair appearing. An instance of the last exists in the case before us. A receipt of John Farrar is offered by the defendants, which is dated in 1809. It is obviously of a later period, and was first written "1830." If this credit rested on the receipt, it would be rejected. But it does not. The judgment, to which it refers, was rendered against the administrators themselves in 1808; and a lapse of twenty-three years, and the possession of the paper by the defendants, is strong presumptive evidence of the payment by them. For these reasons, the first exceptions of the plaintiff is overruled. It might be referred back on this point, if the plaintiff had upon affidavit stated a well grounded belief that injustice was done.
A part of the second exception of that party is founded on the master's having received in evidence several receipts of sheriffs, expressed to be for money paid on judgments and executions in court, instead of having the record. This would be allowed, but has been (139) expressly abandoned by the plaintiff, and is therefore disallowed.
The third exception arises upon this state of facts: Early in 1806 James Finch purchased from the defendant Robert Ragland two negroes, at the price of $650, for which he gave his bond with the intestate, Adam, his surety, payable December, 1807. The intestate died in November, 1806, before which time James removed to Georgia. The bill charges that he was well able to pay the debt, but that the defendants lost it by neglecting to sue, and puts a direct interrogatory to the defendants whether James was not solvent. The defendant Branson, one of the administrators of Harper, says that he has no particular knowledge of the residence and circumstances of James Finch, but that he has always understood that he removed to Georgia, and was insolvent. The defendant Robert Ragland, the surviving administrator, says that James Finch became indebted here, and was obliged to sell one of the negroes to one Snipes in Chatham, who paid him (Ragland) $160 on his bond when it fell due; that he then transferred the bond to Harper; that James Finch was then insolvent, and has remained so ever since, as he believes. The plaintiffs have taken the deposition of Crawford, who says that he lived with James Finch in Georgia in 1805, and that he was then able to pay $600; for that in the next year, 1806, he came into this State *Page 118 
and brought two negroes, which he carried out. Upon this case, the plaintiffs contend that the administrators were bound to sue, or show the insolvency of James Finch, while the defendants insist, first, that they were not bound at all to go out of this State; and, secondly, that the insolvency sufficiently appears. Upon the first point the Court sees no reason to question the rule lately laid down. But it is not necessary to consider its application to the present case, because the insolvency of James Finch sufficiently appears. His solvency and the neglect of the defendants are directly alleged in the bill. They are as directly (140) denied in the answer. That the defendants did make exertions to collect the money from him is not pretended; but if he was, in fact, insolvent, exertions would have been unavailing. That fact is positively affirmed in the answer in response to an express allegation of the plaintiff. It may be said that the defendant ought to discharge himself by proof. In such case, the answer is proof. If an administrator inventory a debt as desperate, he cannot be charged with it but by proof on the other side that it was collected or might have been. Here the plaintiffs have sought to charge the defendants upon their own oath. They must take their answer — subject, indeed, to be disproved. This the plaintiffs have attempted; but instead of succeeding, their case is rather weakened by it. James Finch is the brother-in-law and uncle of the plaintiffs, and it is presumed better known to them than to the defendants. Yet they have examined but one witness, and he in North Carolina, who only proves that in his opinion James Finch was able to pay this debt two years before it fell due. The reason he gives for that opinion is that he bought two negroes in this State in 1806. He does not mention any other property. It turns out that he had not paid for them, but that he bought them on the credit of his brother; that they are the very negroes for which the debt now in controversy was contracted, and that he was obliged to sell one of them before he returned to Georgia. The inference from this deposition cannot be that he was solvent; but as this is all the proof which the plaintiffs have been able to collect, the answer is rather fortified by its insufficiency. The third exception ought, therefore, in my opinion, to be overruled. But a majority of the Court is of opinion that the fact of James Finch's solvency or insolvency doth not sufficiently appear in the answers and proofs to enable the Court to determine the propriety of subjecting the plaintiffs or defendants to the loss of this debt, and that it is a proper case for a further inquiry by the master. This exception, and the credit to which it refers, will therefore stand for the present, as being neither allowed nor disallowed; and a further inquiry will be directed to be made on this point, (141) in time to act on the report at the next term. *Page 119 
The fourth and fifth exceptions relate to the allowance of commissions. It is not a universal rule that commissions will not be allowed where an account has not been kept. But it will be a general rule in this Court, since it argues either a fraud or negligence which nearly amounts to it. Here it does not appear that the defendant ever returned to the county court on account of current, or got an allowance of commission there. Neither does he exhibit and account with his answer. A trustee must be indifferent to the fairness of his conduct who is unable to render any account. It imposes upon the cestui que trust the burden of hunting up evidence to charge him; whereas an honest man would charge himself. Under these circumstances, all claim for commissions would be rejected were not the condition of the defendant very particular. He is a surviving administrator, and his coadministrator, who transacted much of the business, died nearly twenty years ago. The children of the intestate were infants, and the defendant avers that he frequently applied to their guardian to come to a settlement, and obtained the irregular but common order of the court appointing auditors; but the guardian would do nothing. This may serve for an excuse in the present case, considering the loose manner in which executors have been permitted to keep their accounts; But it will not be taken as a precedent. The Court doth not, therefore, positively allow these two exceptions (fourth and fifth) in their whole extent. But the exceptions are allowed so far as they relate to the commissions calculated on debts owing from the intestate to either of the administrators, or on debts due to the intestate from them; but this does not include the prices of property bought by them at the sale, because they are charged with the prices obtained upon the resales. In all other respects the matter of these two exceptions is reserved until the coming in of the report now to be ordered. If upon computation it shall turn out that the defendants had, including a reasonable commission, disbursed the whole estate or very nearly, then the presumption that the accounts were withheld from improper motives (142) will be rebutted.
Having disposed of the exceptions of the plaintiffs, we come now to those of the defendants.
The first is against the charge made by the master, of interest on the debts due the intestate, as mentioned in the inventory, from the time they fell due, and that on the sales made by the administrators, from the time they fell due. This objection rests upon the principle that executors are not liable for interest before the expiration of two years, unless it be proved they received it.
If debts bear interest, of course the executor receives it up to the time of payment. If he will not keep accounts, to show when he did *Page 120 
receive the money, and how much, there are but two things the Court can do. One is to charge him with interest, at the risk of making him pay it while the money lies by him. The other is to let him keep the interest actually received by him as his own, and use the testator's money for his own purposes; and that there may be no evidence of the amount of interest collected, or of the amount of principal used by him, encourage him not to keep accounts, or full and true ones. Which of these principles ought to govern, it cannot be necessary to say. There is no alternative but one of the foregoing. This exception is overruled.
The second exception is that the master refused to allow a credit for the debts to Griffis on two notes. The master states his reason to be that it was not proved that they were paid by the administrators, and there is no receipt on them. They are produced by the administrators. But that is not sufficient, as they may have been paid by the intestate. If the case rested there, the report would stand. But there appear with the notes, as exhibits in the suit, two warrants issued on them in 1808 against the administrators, in which the plaintiff was nonsuited, because the witness did not attend to prove the notes — from which the plaintiff appealed. It does not appear positively what was done on the appeals; but it cannot be doubted that the defendants settled them. (143) This evidence is conclusive that the intestate did not pay the debts, and the possession of the notes shows that either he or the administrators paid them. This exception is, therefore, allowed.
The third exception arises on the following state of facts, specially reported by the master: In May, 1808, the defendant Robert Ragland and Abram Harper, the administrators, confessed two judgments: the one to Branson and Harper for £ 37 18, and the other to Abram Harper Co., for £ 217 5. In each of these firms Harper, the administrator, was a partner; and the master reports that he had seen the books of those firms, in the former of which Finch is debited with £ 29 7 6, and credited November, 1804, by H. Branson with £ 4 17, and on 2 July, 1808, with cash from J. Sellers, £ 14 2 6, leaving a balance of £ 9 18. In the books of A. Harper Co., it appears that Finch settled his accounts 28 August, 1803, and gave his bond for £ 141 19 1, and that before his death he had other dealings to the amount of £ 118 2 11 — making in the whole £ 260 1. The books show sundry credits in 1804 and 1805, amounting to £ 153, which the master deducts from the debits, thereby producing a balance of £ 109 1, which he supposes the true debt. When the judgments were confessed, Mr. Harper drew up the accounts, which he swore to and filed in the cause. They are exhibited in this suit. That of Branson and Harper corresponds in the debits with the books themselves, with the exception of £ 6 10, for interest, and £ 2 0 6, money paid *Page 121 
after Finch's death. Both credits are, however, omitted. That of A. Harper Co., does not correspond with the books as to the debits. It omits the note for £ 141 19 1 altogether. It omits some of the items which composed the sum for which that note was given, and includes others not appearing on the books. One charge on 22 August, 1803, against Finch is "to John Farrar" £ 98 1, which was sunk in the £ 141 19 1. Another charge on the same day after the note is "John Farrar" £ 16 10. The account filed in the action at law gave no credit for any part of the £ 153, but charges, in addition to what appears on the books, the sum of £ 18, assumed for Jenks and the sum of £ 8 13 6, assumed for Carpenter. Upon this state of the case, the master rejected the judgments altogether, and the defendants (144) except.
The Court views with extreme jealousy the dealings of an administrator, for his own benefit, with the intestate's estate; and in like manner the admissions of one administrator in favor of another. It is a suspicious circumstance that an attempt was here made to conclude the matter by judgments. They are a nullity in themselves, and no effect is given to them as judgments, but only as evidence of a settlement between the administrators. As such they may stand, except so far as they appear to be unjust. If Harper were now living, he would be held bound to prove the debt again. The judgment does not admit it, except under circumstances. We cannot say that an administrator cannot recognize the justice of a demand of his coadministrator, but that an acknowledgement will not be conclusive, nor even dispense with proof, when the situation of the parties is such as to enable them to give proof. There seems to be no reason in the case before us to believe that Ragland did, or had a motive corruptly to admit an unjust demand. He does not seem to have known or had reason to believe it unjust. Nor does Harper's conduct exhibit a fraudulent purpose. He made oath to his demand, and he filed the account of record, that resort might be had to it at a future day by those interested to investigate it. And it appears that a large part of the debt was due — that is, it appears from entries made in his books in Finch's lifetime, when there is no reason to suppose he had any expectation of administering. The whole demand may possibly have been just; and it might possibly stand in taking the accounts at this remote day, and long after the death of Harper. And clearly, I think, the whole is not to be rejected because the whole account cannot be supported. But as the books are produced, I think they must govern us, except as to the items added in the account filed, of which entries were never made on the books. These are the sums of £ 18, for Jenks, and £ 8 13 6 for Carpenter. If these be added (145) *Page 122 
to the sum of £ 260 1, the sum of £ 287 6 will be made, from which the sum of £ 153 being deducted, the balance will be £ 134 36, with interest thereon to be computed from the dates of the items in the books. For this sum alone, I think, the judgment ought to stand; and for that I think it ought, because that sum appears to be justly due. The exception is, therefore, allowed so far as respects the sum of £ 134 3 6, principal of the judgment in favor of Abraham Harper Co.
After the foregoing opinion had been delivered and a decree entered according thereto, the plaintiffs' counsel filed a petition to rehear so much of the decree as allowed commissions to the administrators, and also so much thereof as sustained the defendant's exception to the master's report, rejecting entirely the credit claimed for the debts due to Abraham Harper Co. and to Branson and Harper.